UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

| | |
|---|---|
| GARY M. ANDRES, SR., Executor of the Estate for JOHN R. ANDRES, Deceased, | ) ) ) NO.: 0:21-cv-61757-JEM |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| AEROJET ROCKETDYNE, INC., *et al.*, | ) ) ) |
| Defendants. | ) |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT HUNTSMAN CORP.'S MOTION TO DISMISS SECOND AMENDED COMPLAINT FOR LACK OF PERSONAL JURISDICTION**

Plaintiff, Gary M. Andres Sr., Executor of the Estate for John R. Andres, ("Plaintiff"), by and through his attorneys, Maune, Raichle, Hartley, French, and Mudd, LLC, and pursuant to S.D. Fla. L.R. 7.1 hereby files their Response To Defendant Huntsman Corp.'s Reply in Support of its Motion to Dismiss for Lack of Personal Jurisdiction, and in support thereof, states the following:

**PRELIMINARY STATEMENT**

Mr. Andres was diagnosed with malignant mesothelioma—a rare and invariably fatal cancer almost always caused by asbestos exposure—in July 2020. Mesothelioma killed Mr. Andres within a month of diagnosis. As alleged, Decedent John Andres—a career aerospace engineer—was exposed *in Florida* to asbestos from products for which Defendant Huntsman Corporation ("Huntsman") is liable. Additionally and out of an abundance of caution, Plaintiff has moved for leave to add other additional defendants (Dkt. 233), who Huntsman has identified, yet not confirmed, may hold liability for the asbestos containing aerospace adhesive products. (Dkt. 208). If, as hinted by Huntsman, one of its subsidiaries does in fact have liability for the products at issue in this case, then discovery will bear this fact. Because Huntsman products were marketed and sold to the Apollo Program for use on a vehicle was designed, assembled, and intended to be

1

launched from the State of Florida, simply stating that Huntsman is a holding company does not completely divest Huntsman of all potential liability.

Earlier this year, the Supreme Court clarified the doctrine of specific personal jurisdiction in Ford Motor Co. v. Montana Eighth Judicial District Court, 141 S. Ct. 1017 (2021) (*Ford*):

> [I]f the sale of a product of a [defendant] is not simply an isolated occurrence, but arises from the efforts of the [defendant] to serve, directly or indirectly, the market for its product in [several or all] other states, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury

*Ford*, 141 S. Ct. 1017, 1027 (2021) (quoting World-Wide Volkswagen, 444 U.S. 286, 297 (1980)).

As alleged, Decedent John Andres, a career aerospace engineer, was exposed in Florida to asbestos from products for which Defendant Huntsman Corporation ("Huntsman") is liable. Huntsman has served the national aerospace market which is, almost exclusively, tied to Kennedy Space Center and the National Aeronautics and Space Administration (NASA) programs. Because Huntsman ducks the central issue to focus on a corporate shell game rather than divesting itself of liability, the question of whether Huntsman served ("directly or indirectly") the national aerospace market and exposed Mr. Andres to asbestos *in Florida* remains—its Motion to Dismiss (Dkt. 364) must be denied.

### FACTUAL & PROCEDURAL BACKGROUND

This case was removed under 28 U.S.C. § 1442(a)(1)'s "federal officer" removal provision. The following facts derive from the First Amended Complaint (Dkt. 233) and accompanying Information Form filed with the original complaint (Dkt. 1-3, 76–78) and Exposure Sheet (Dkt. 1-3, 69–75), both of which were served on all defendants with the Complaint. *See* FED. R. CIV. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

From 1949 to 1953, Decedent John Andres was a naval aviation mechanic, serving at (*inter alia*) Jacksonville NAS in Jacksonville, Florida. (Dkt. 233, 10.) There, he routinely maintained, repaired, and replaced numerous asbestos-containing aircraft components, including adhesives. (*Id.*) After leaving the Navy, Mr. Andres worked for North American Aviation (a/k/a "Rockwell International," hereinafter "Rockwell") until 1987. (*Id.*) His aerospace work for Rockwell took him to various locations in the United States, including to the Kennedy Space Center, Cape Canaveral, Florida. (Dkt. 233, 10-11, Dkt 1-3, 76–77.)

The evidence in this case will demonstrate, *inter alia,* that Mr. Andres was involved during the construction, testing, and launching of numerous spacecraft, including the Apollo Missions, while at Kennedy Space Center. During his time with Rockwell, Mr. Andres routinely assembled, maintained, installed, repaired and replaced numerous asbestos-containing aircraft and spacecraft components, including adhesives. (Dkt. 233.) Mr. Andres' son (the executor for the estate) sued Huntsman Corporation expressly for exposure to "[a]sbestos-containing aerospace adhesives" during Mr. Andres' time at Rockwell. (Dkt. 233). According to the Complaint, Huntsman purposefully availed itself of the protection of Florida law and could reasonably have foreseen being hailed into Florida courts; knew its asbestos-containing products were sold in Florida; directly (or indirectly) availed itself of a market that included Florida; and engaged in a course of conduct that was nationwide with respect to the distribution of Huntsman's asbestos-containing products. (Dkt. 233, 7.) Mr. Andres was a Florida resident when he was exposed to Huntsman's toxic products in Florida while working with those products in the manner in which they were intended to be used. (Dkt. 233, 8-9; 15.)

Now, pursuant to Rule 12(b)(2), Huntsman has moved for dismissal based on a personal jurisdiction defense. Huntsman's motion is supported by a sworn declaration from its Assistant Treasurer Joe Hambor (the "Hambor Declaration," Dkt. 364-1). The ten-paragraph Hambor Declaration generally lays out Huntsman's current business structure and avers, *inter alia*, that Huntsman "has never engaged in any substantial activity in Florida," that it has "never operated, conducted, or engaged in a business venture based in Florida," that it "has never had an office or

3

resident agents working on its behalf in Florida," that it has never "designed, processed, manufactured, serviced, or sold any products or materials in Florida or elsewhere," and that it has "never committed a tortious act in Florida." (*Id.*)

While Huntsman has alleged that Mr. Wheatley, a fact witness deposed on November 18, 2021, made no reference to aerospace adhesives, Huntsman fails to acknowledge that the Scheduling Order in this case delineates that all discover must conclude on April 7, 2022. (Dkt. 6, 5). Nowhere, in case law or the Scheduling Order, does it suggest that Plaintiff must rely on the testimony of one fact witness to determine whether or not the allegations of personal jurisdiction are satisfactory. Mr. Wheatley will not be the only fact witness in this case and therefore has no bearing on Huntsman's Motion. Huntsman cannot now attempt raise the burden of proof for a Motion to Dismiss (being a mere proper allegation) to one that would require a much higher standard found in, for instance, a Motion for Summary Judgement. Discovery is still ongoing and this Court must allow Plaintiff to investigate and discovery pertinent facts, most notably, if Huntsman has liability for asbestos containing products, the nexus of Plaintiff's claim.

Huntsman's nebulous factual and legal contentions miss the mark. Because Huntsman (and its predecessor entities for which it is liable) placed toxic goods into the nationwide market for aerospace products, and because those goods injured Mr. Andres in Florida, this Court has specific personal jurisdiction over Huntsman.[1]

**MEMORANDUM OF LAW**

### I. *Motion to Dismiss*

To overcome a Rule 12(b)(2) motion, a plaintiff must simply establish a *prima facie* case of personal jurisdiction over an out-of-state defendant. *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006). If it decides the jurisdictional question solely on the basis of pleadings and affidavits, a court must accept as true the allegations of the complaint "which are not controverted by defendant's evidence and deny the motion to dismiss if the plaintiff

4

presents a *prima facie* case of jurisdiction." *Bracewell v. Nicholson Air Servs., Inc.*, 748 F.2d 1499, 1504 (11th Cir. 1984).

A defendant can challenge a plaintiff's *prima facie* showing via affidavit, but affidavits that "contain only conclusory assertions" do not discharge the defendant's burden. *Aronson v. Celebrity Cruises, Inc.*, 30 F. Supp. 3d 1379, 1385 (S.D. Fla. 2014) (citing *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002)). An affidavit that simply explains a defendant's corporate structure and status, summarily asserts the defendant has not done business in (or directed contacts into) Florida, and denies in a conclusory way any actions that would trigger personal jurisdiction is "of little significance to the jurisdictional question" and cannot shift any evidentiary burden back onto the plaintiff. *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1215 (11th Cir. 1999).

### 1. Specific Personal Jurisdiction

Establishing specific personal jurisdiction in Florida courts requires a twofold inquiry. *Carmouche v. Carnival Corp.*, 36 F. Supp. 3d 1335, 1340 (S.D. Fla. 2014); *Hebert v. Davinci Compass, Inc.*, 2017 WL 7794275, at *2 (S.D. Fla. 2017) (both citing *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 626 (11th Cir. 1996)). First, the Court must determine whether Florida's long-arm statute provides a sufficient basis for personal jurisdiction. If so, the Court must ascertain whether federal due process requirements (which derive from the Fourteenth Amendment) are satisfied. *Id.*[1]

#### a. Florida Long-Arm Statute

---

[1] Courts have alternatively acknowledged that the "general jurisdiction" provisions of the long-arm statute are co-extensive with the limits on personal jurisdiction imposed by the Due Process Clause, *Fraser v. Smith*, 594 F.3d 842, 846 (11th Cir. 2010), and that the Due Process Clause imposes "a more restrictive requirement" than does Florida's long-arm statute, *Melgarejo v. Pycsa Panama, S.A.*, 537 F. App'x 852, 860 (11th Cir. 2013) (citing *Internet Solutions Corp. v. Marshall*, 39 So. 3d 1201, 1207 (Fla. 2010)). Though it should follow that satisfying the Due Process Clause satisfies the less (or possibly equally) restrictive long-arm statute, Florida courts have been reluctant to depart from the two-pronged approach.

Florida's long-arm statute enumerates ten ways a non-resident defendant can be subject to the jurisdiction of Florida courts. *See* Fla. Stat. § 48.193. As relevant here, the statute applies where a defendant commits a tortious act within Florida, § 48.193(1)(a)(2); or causes injury to persons or property within Florida *arising out of an act or omission by the defendant outside Florida* if products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within Florida in the ordinary course of commerce, trade, or use, § 48.193(1)(a)(6)(b); or where the defendant—whether or not the claim arises from its in-state activity—is engaged in substantial and not isolated activity within Florida, whether such activity is wholly interstate, intrastate, or otherwise, § 48.193(2).

### b. Fourteenth Amendment Due Process Clause

The "canonical" decision regarding the limits of a state's power to exercise jurisdiction over a defendant remains *International Shoe Co. v. Washington*, 326 U.S. 310 (1945). *Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*, 141 S. Ct. 1024, 1027 (2021). A tribunal's authority over a defendant depends on the defendant having "such contacts within the forum State that the maintenance of the suit is reasonable, in the context of our federal system of government, and does not offend traditional notions of fair play and substantial justice." *Id.* Courts in this Circuit apply a three-part test examining **(1)** whether the claims arise out of or relate to at least one of the defendant's contacts with the forum; **(2)** whether the nonresident defendant purposefully availed itself of the privilege of conducting activities within the forum state (thus invoking the benefit of the forum state's laws); and **(3)** whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice. *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013).

Like we have previously stated"Earlier this year, the Supreme Court clarified the doctrine of specific personal jurisdiction in *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017 (2021) ("*Ford*"):

> [I]f the sale of a product of a [defendant] is not simply an isolated occurrence, but arises from the efforts of the [defendant] to serve, directly or indirectly, the market for its product in [several or all] other states, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury…"

*Ford*, 141 S. Ct. 1017, 1027 (2021) (quoting *World-Wide Volkswagen*, 444 U.S. 286, 297 (1980)).

In the recent *Ford* decision, the Supreme Court reiterated that "specific jurisdiction attaches in cases…when a company…serves a market for a product in the forum State and the product malfunctions there." *Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017, 1027 (2021). The "contacts" needed for specific personal jurisdiction "often go by the name 'purposeful availment,'" and may not be "random, isolated, or fortuitous." *Id.* at 1024–25. A plaintiff's claims must still "arise out of or relate to" the defendant's contacts, but the inquiry does not require proof that the plaintiff's claim came about because of a defendant's in-state conduct. *Id.* at 1025–26.

Where a plaintiff alleges injury occurs in a forum state, and that forum state's market has been served by a defendant whose product causes the injury, "there is a strong relationship among the defendant, the forum, and the litigation." *Id.* at 1028. *See also id.* (Alito, J., concurring) ("If a … manufacturer makes substantial efforts to sell [its products] in States A and B (and other States), and a defect in a [product] first sold in State A causes injuries in an accident in State B, the manufacturer can be sued in State B."). Of course, *Ford* does not obviate the requirement that traditional notions of fair play and substantial justice cannot be offended by permitting jurisdiction, but the burden for establishing otherwise is on a defendant, and depends on factors like **(1)** the defendant's burden, **(2)** the forum state's interest, **(3)** the plaintiff's interest in convenient and effective relief, **(4)** the judicial system's interest in efficient resolution, and **(5)** the state's shared

interest in furthering fundamental social policies. *Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.*, 207 F.3d 1351, 1358 (11th Cir. 2000).

### 2. *Jurisdictional Discovery*

Before a court dismisses a case for a lack of jurisdiction, a plaintiff must be permitted a full opportunity to investigate the relevant jurisdictional facts. Thus, to the extent the Court has any question regarding its jurisdiction, jurisdictional discovery should be allowed where a plaintiff has identified facts that, if proven, could establish jurisdiction. *Eaton v. Dorchester Development, Inc.*, 692 F.2d 727, 730 (11th Cir. 1982). A plaintiff must be given an opportunity to develop facts sufficient to support a determination on the issue of jurisdiction, and the rules of civil procedure entitle a plaintiff to elicit material through discovery before a claim may be dismissed for lack of jurisdiction. *Id.*

## ANALYSIS

By operation of federal rule, this Court considers the Complaint in addition to the Information Form and Exposure Sheet that were served therewith. FED. R. CIV. P. 10(c). The allegations in those documents *easily* trigger Florida's long-arm statute and the federal due process standard. Under the plain language of the long-arm statute and the controlling reasoning in *Ford*, Plaintiff's allegations easily establish a *prima facie* basis for the exercise of specific personal jurisdiction over Huntsman.

Huntsman's motion fails as a matter of both fact and law. As a factual matter, the Hambor Declaration is both false and irrelevant, and cannot overcome Plaintiff's *prima facie* showing. As a legal matter, Huntsman chooses to ignore *Ford* altogether, putting its analysis near the boundary of zealous advocacy and frivolity.

1. **No Jurisdictional Challenge via the Affidavit: The Hambor Declaration is Meaningless vis-à-vis Specific Personal Jurisdiction, and Directly Contradicts Publicly Available Records.**

Huntsman's motion is supported by only one piece of evidence, the Hambor Declaration. Before turning to the meritorious allegations in Plaintiff's pleadings, the inadequacy and potential falsehoods of the Hambor Declaration warrant attention.

Most of the paragraphs in the Hambor Declaration sidestep the jurisdictional inquiry altogether. For example, "2. Huntsman is a corporation organized under the laws of the State of Delaware", "3. Huntsman's principal place of business is in the Woodlands, Texas", "4. Huntsman is a holding company" have no effect whatsoever in shifting the burden regarding personal jurisdiction. ("Hambor Declaration," Dkt. 364-1, para. 2-4). *See Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1215 (11th Cir. 1999) (reasoning that conclusory affidavits that do little more than explain a defendant's corporate structure cannot defeat a *prima facie* showing of personal jurisdiction); *Aronson v. Celebrity Cruises, Inc.*, 30 F. Supp. 3d 1379, 1385 (S.D. Fla. 2014).

Perhaps worse for Huntsman is that the Hambor Declaration appears to include several outright falsehoods. For instance, Mr. Hambor states that "Huntsman has never engaged in any substantial activity in Florida", "never operated, conducted, or engaged in a business venture based in Florida", and "never had an office or resident agents working on its behalf in Florida" ("Hambor Declaration," Dkt. 364-1, para. 5-7). On Huntsman's own website, Huntsman claims an economic impact for its **Pensacola, Florida plant** that celebrates Huntsman's "5 associates and 34 contractors [employed] as of February 2020". (See Economic Impact of the Pensacola, Florida Plant attached hereto as **Exhibit 1**). This very publication revels Huntsman's commitment to products, ***made in Florida,*** to continue to serve the automotive and transportation industry, the construction industry, and the energy and fuel industry. This Florida-based plant, as Huntsman states, has created $4.2 million dollars in salaries wages and benefits for [Huntsman] employees. (*Id.*). Further, as discussed in detail below, Huntsman has liabilities for products that were regularly sold to the national aerospace industry and certainly served the global market (i.e. never to exclude Florida). (*See*

9

**Exhibit(s) 4, 7, 12 & 13**). Operating a manufacturing plant located inside the forum state and serving asbestos-containing products to the global market makes Mr. Hambor's declarations in paragraphs 5, 6, 7, 11, and 12 invariably misleading, and potentially completely false.

With only an irrelevant, possibly false affidavit to stand on, Huntsman is left with little more than an argument that Plaintiff's allegations do not make a *prima facie* case of specific personal jurisdiction. Unfortunately for Huntsman, its argument completely ignores both the plain language of the long-arm statute and the existence of this year's controlling *Ford* decision. Plaintiff's Complaint specifically alleges that Huntsman (a chemical company) designed, manufactured, sold, supplied and/or rebranded products or material manufactured by others as to be a manufacturer under Florida Law asbestos containing products, notably "[aircraft and spacecraft] components and component parts including…adhesives, sealants, coating and insulation". (Dkt. 233, ¶7 at 9).

Further, Huntsman is being sued as a manufacturer and supplier of asbestos-containing products that were used in the manner in which they were intended to be used. (Dkt. 233, 15-16). Huntsman's asbestos products failed to perform their purposes safely in that they caused Decedent John R. Andres to develop malignant mesothelioma and die. (*Id.*). Huntsman's products were designed to contain asbestos in order to function as intended, and the equipment in which those products were used required the periodic manipulation and/or replacement of the products to properly function. (Dkt. 233, 9 – 11).

Plaintiff's Complaint contains numerous allegations that support the exercise of personal jurisdiction over Huntsman, including but not limited to:

- Huntsman has conducted business or business ventures which subjects it to jurisdiction within Florida (Dkt. 233, ¶6(a) p. 7);
- Plaintiff's causes of action arise out of, or relate to, Huntsman's business or business ventures conducted within Florida or through which Huntsman purposefully availed itself

of Florida, invoked the benefits and protections of Florida law, or otherwise could reasonably have foreseen that its activities would subject it to jurisdiction of the Florida courts (Dkt. 233, ¶6(b) p. 7);

- Huntsman's asbestos-containing products were sold in Florida, and Huntsman was aware that its products would be sold in Florida, and it directly or indirectly availed itself of the Florida market as a market for its products (Dkt. 233. ¶6(c) p. 7);
- Huntsman engaged in a course of conduct that was nationwide, including within Florida, in its distribution and sales of its asbestos-containing products, and in its failure to provide adequate warnings (Dkt. 233, ¶6(d) p. 7);
- Huntsman specifically targeted Florida, directly or indirectly, as a market for its asbestos-containing products (Dkt. 233, ¶6(e) p. 7);
- Huntsman's asbestos-containing products acted upon Mr. Andres in Florida (Dkt. 233, ¶6(f) p. 7);
- Huntsman has, through agents, employees, brokers, jobbers, wholesalers, or distributors sold, consigned, or leased tangible personal property to persons in Florida (Dkt. 233, ¶6(g) p. 7);
- Huntsman designed, developed, tested, manufactured, assembled, distributed, labeled, packaged, and/or created a marketing strategy for its asbestos products in Florida (Dkt. 233, ¶6(h) p. 7);
- Huntsman has committed wrongful acts either outside or inside Florida causing injury to Mr. Andres, including breaching its duty to warn persons such as Mr. Andres of the dangers of its products and/or its continuing duty to warn to avoid further asbestos exposures (Dkt. 233¶6(i) p. 7);

- Huntsman derived substantial revenue from interstate or international commerce and should reasonably have expected its acts to have consequences in Florida or any other state that would subject it to liability in those states (Dkt. 233, ¶6(j) p. 7 – 8);

- Huntsman has conducted substantial and not isolated activity within Florida (Dkt.233, ¶6(k) p. 8);

Even if this Court gave minute acknowledgment of Huntsman's conclusory and potentially false affidavit, Plaintiff has clearly alleged facts with enough specificity to survive this challenge. Defendant's first argument must fail.

2. ***The Long-Arm Statute is Satisfied: Plaintiff has Alleged Injury Within Florida from Products for Which Huntsman is Liable.***

Decedent John R. Andres was a Florida resident when he was exposed to Defendant's products. Further, it is alleged that the asbestos-containing products to which Mr. Andres was exposed were purchased and used in Florida. This Court has a strong interest in protecting the citizens and consumers within the State from exposure to dangerous products; and providing them with an effective and efficient forum for resolution of disputes regarding their injuries, particularly injuries caused by actions in the State and/or that manifest themselves in the State. (Dkt. 1-2, ¶6(n) p. 8).

Huntsman specifically claims that it should not be subject to personal jurisdiction under Florida's long-arm statute because it "***has not engaged in any substantial activities in Florida***". (Dkt. 198-2). (Emphasis added). In support of this meritless and downright misleading representation, Huntsman alleges that it has never "(1) operated a business in Florida, (2) had an office in Florida, (3) committed a tortious act in Florida, (4) owned real property in Florida, (5) contracted to insure anyone in Florida, (6) engaged in any significant service or solicitation activities in Florida, or (7) worked with any products or materials in Florida". (*Id.*). However, Huntsman has engaged in a multitude of actions that satisfy Florida's long-arm statute. From

Huntsman's own admission via their "Annual Report Pursuant To Section 13 or 15(D) of the Securities Exchange Act Of 1934 For The Fiscal Year Ended December 31, 2010" (attached hereto as **Exhibit 2** and hereinafter referred to as Huntsman's SEC 10k Filing), Huntsman states:

> "We believe we are North America's largest producer of maleic anhydride, a highly versatile chemical intermediate that is used to produce UPRs, which are mainly used in the production of fiberglass reinforced resins for marine, automotive and construction products. Maleic anhydride is also used in the production of lubricants, food additives and artificial sweeteners. We have the capacity to produce approximately 340 million pounds annually at our facilities located in **Pensacola, Florida** and Geismar, Louisiana."
>
> *See Huntsman's SEC 10k Filing at pg. 10 (emphasis added),*

> "Our LAB facility in Chocolate Bayou, Texas and our maleic anhydride facility in **Pensacola, Florida** are both located within large, integrated petrochemical manufacturing complexes operated by Ascend. We believe this results in greater scale and lower costs for our products than we would be able to obtain if these facilities were stand-alone operations"
>
> *See Huntsman's SEC 10k Filing at pg. 15(emphasis added).*

Huntsman's own SEC filings clearly demonstrate that it operated and maintained a business in Florida as it touted its success in serving the Florida market. This sole document, one that Plaintiff were able to ascertain without the benefit of discovery, arguably disproves four (4) out of the seven (7) claims by Huntsman regarding its business contacts with Florida.[2]

Without the benefit of having conducted discovery, Plaintiff is in possession of documents which indicate Huntsman is responsible for various asbestos-containing products that were used in the aerospace industry, namely aerospace adhesives, including in Florida. For instance, and by way of example only, Furane Aerospace Products and/or Furane Plastics Inc., made, marketed, and sold

---

2 Plaintiff is without sufficient information at this stage of the litigation to determine where the specific products to which Mr. Andres was exposed were manufactured, including whether they were manufactured in Florida, and this remains under investigation.

asbestos-containing aerospace adhesives which were used in the intended manner while Mr. Andres was exposed to those products in Florida. Most notably, Furane has previously acted as a contractor for NASA in a "Production Development of Organic Nonflammable Spacecraft Potting Encapsulation and Conformal Coating Compound" (attached hereto as **Exhibit 3**). In this document labeled "Contract NAS 9-11068", Furane Plastics, Inc. breaks down nearly 100 pages of products and tests done in conjunction with NASA, specifically at Johnson Space Center in Houston, TX and White Sands Test Facility in New Mexico, for use and installation on NASA's spacecraft for construction and launch at Kennedy Space Center in which Mr. Andres worked. (*Id.* at 101–110).

Plaintiff maintains that Huntsman has liability for the Furane asbestos-containing products at issue. In "Huntsman Advanced Materials: Overview Presentation" (attached hereto as **Exhibit 4**), Huntsman traces its history to 1884 where Chemical Industry Basel (CIBA) is formed. Ciba merged with J.R. Geigy to form Ciba-Geigy in 1971. A number of mergers occur until 2003 when Huntsman took over operations. (*See* **Exhibit 4**, pg. 4, **Exhibit 13**). Huntsman products include products marketed under the trade names Araldite, **Epocast**, **Epibond**, Uralane, RenShape, Arathane, Arocy, Eposert, and Aradur – all products designed and developed as epoxy, adhesives specifically with application in the aerospace market. (*Id.* at 5)(emphasis added). According to Huntsman, "Furane" introduced asbestos-containing products Epocast to the electronics market in 1954 and Epibond to the adhesives market in 1955, both of which were being used by the NASA program on the Apollo program for which Plaintiff alleges exposure. A carcinogenic report demonstrates a number of adhesives products, for which Plaintiff alleges Huntsman is responsible, contained asbestos, including Ebibond 122 (20% asbestos), Epibond 1210 (5% asbestos), and Epocast 2-D (1% asbestos). (See **Exhibit 5**).

In the NTRS (NASA Technical Reports Server, Furane Plastics Incorporated submitted a 402 page "Contractor Report" from 1971 in order "to develop a flexible compound which not only

14

functioned in a manned aerospace environment as an effective electrical insulation, but whose flammability characteristics in 16.5 psia, 60% oxygen/40% nitrogen were evidenced by rapid self-extinguishment and minimal thermal (pyrolysis) degradation." (*See* **Exhibit 14**). Not only does this document prove Furane Plastics Inc. as a NASA contractor, the report itself details twelve (12) testing applications of which NASA controlled and performed five (5) (*See* **Exhibit 14** pg. 29-30) and Furane Plastics Inc. sourced materials (aerospace potting, encapsulating, and conformal coating compounds). (*Id.* at 43). This report details the results of testing including the effect that asbestos may have on the products. (*Id.* at 58).

Like North American Rockwell and Furane Plastics Inc., several other companies were awarded contracts to develop certain aspects of the Apollo program. For example, Plaintiff has obtained a drawing of Apollo 16 (attached hereto as **Exhibit 6**) that displays the components of the Apollo Rocket and the developers for each section. Companies like Rockwell, Grumman Corporation, McDonnell-Douglas, and Boeing worked together to develop this spacecraft. A "Potting Kit Document" from the Grumman Company shows that Furane Plastics Inc. supplied 2-Epocast 4-K Resin and 2-Epocast 9421 Hardener. (*See* **Exhibit 7**). Epibond and Epocast are trademarks now owned by Huntsman and have been since the 1950s. (*See* **Exhibit 8, Exhibit 9**).[3] Additionally, Bendix Aerospace Systems Division played a major role in the construction phases of the Apollo Program (*See* **Exhibit 10-11**). Bendix Aerospace documents show that Furane Plastics products, specifically Epocast 8179 and Epocast 221, were approved for use in Bendix aerospace applications. (*See* **Exhibit 12,** pg. 30, 42).

Upon information and belief, based on the publicly available documents that Plaintiff has managed to find by way of a simple "Google search", Huntsman is liable for asbestos-containing

---

3 Huntsman's active registered trademarks include **Epibond** (Serial Number 71680670. Registration Number 0613707. Filed on 10-11-1955.); **Epocast** (Serial Number 71670351. Registration Number 0612844. Filed on 07-21-1954); https://trademarks.justia.com/owners/huntsman-advanced-materials-americas-llc-27082/.

adhesive products utilized in Florida during the Apollo space program upon which Mr. Andres worked. There is clear evidence that the products for which Huntsman is liable were designed, developed, tested, manufactured, assembled, distributed and marketed for use in the aerospace industry in Florida. Huntsman's argument on this point, must be denied.

3. *Federal Due Process: Huntsman Served the National Aerospace Market and Huntsman's Products Caused Harm in Florida. <u>Ford</u> Controls.*
   a. **<u>Binding Precedent Renders Huntsman's Service of the National (and Florida) Aerospace Market to be Constitutionally Sufficient "Minimum" Contacts.</u>**

Huntsman has not denied that it has liabilities for asbestos-containing products that entered into the stream of commerce. Where the *Ford* case focused on cars, products like thermosetting aerospace sealants have a more specific audience. Selling products for airplanes, fighter jets and spacecraft certainly has a more limited scope when discussing the national market. Indeed, as is well known, the Apollo space launch programs were carried out at the Kennedy Space Center in Florida. Frankly, Huntsman's products were marketed to Rockwell and its competitors (Grumman, Bendix Aviation) for use in the State of Florida because Florida was, in fact *the* market for space equipment. The fact that Huntsman products ended up in the hands of Rockwell employees at the Kennedy Space Center is no accident nor happenstance.

Huntsman's own publicly available documents show that products like Epibond and Epocast were not so narrowly tailored to be kept in Texas. In fact, Huntsman's goal was to develop and market products (aerospace adhesives and resins) to serve not only the United States, but the "Global Market" including "Americas", representing 24% of revenue in 2012, "Asia Pacific" representing 24% of revenue in 2012, and "Europe" representing 38% revenue in 2012. (*See* **Exhibit 13**, **Exhibit 4**, pg. 10-11). Huntsman clearly covered a global market with their products and in no way can argue that market excluded Florida. Just like in *Ford*, these products were designed, manufactured and sold for use where the case now resides, the state of Florida.

### b. **Huntsman Cannot Meet its Burden of Establishing that Traditional Notions of Fair Play and Substantial Justice would be Offended by Permitting Jurisdiction.**

Huntsman claims that exercising personal jurisdiction over it would contravene the due process requirements of the Fourteenth Amendment. This is, again, simply untrue. In addition to the arguments above concerning Huntsman's availment of the Florida aerospace market, it is not only alleged that Huntsman products were sold nationally, but specifically to consumers in the state of Florida, precisely the issue that the *Ford* decision contemplated. Huntsman has touted its success in the stream of Florida commerce. Huntsman proclaims it serves the Florida market through its Pensacola, Florida plant. (**Exhibit 1**). Huntsman claims that its products, ***made in Florida,*** serve the automotive and transportation industry, the construction industry, and the energy and fuel industry while bringing in $4.2 million dollars in salaries wages and benefits for its employees. (*Id*.). This clearly demonstrates that Huntsman has availed itself of Florida and engaged in intentional conduct to sell products to Florida consumers. There is simply no basis to find that exercising jurisdiction here offends notions of fair play and substantial justice.

All of the factors weigh in favor of Florida jurisdiction. *See Ruiz de Molina*, 207 F.3d at 1358. Defendant, which already has a physical presence in Florida, cannot be said to be burdened by defending a lawsuit here. Florida has a weighty interest in protecting the well-being of citizens like Mr. Andres, who was allegedly poisoned by Huntsman in Florida. *See Ford*, 141 S. Ct. at 1030 (States have "significant interests at stake" in "providing [their] residents with a convenient forum for redressing injuries inflicted by out-of-state actors," as well as "enforcing their own safety regulations.") Plaintiff Gary Andres---a Florida resident suing on behalf of his deceased father who was poisoned in Florida---likewise has a strong interest in convenient and effective relief here in Florida, where Huntsman (and other aerospace defendants who were allegedly present at Cape Canaveral) are all subject to suit. Indeed, were Huntsman to prevail, and force suit in its home state, other out-of-state defendants would scramble to follow the same rule, turning

17

this single-forum case into a patchwork of cases in various state courts across the country. Such a result would hardly serve "the judicial system's interest in efficient resolution." *Ruiz de Molina*, 201 F.3d at 1358.

### 4. *Alternative Request for Jurisdictional Discovery.*

A district court confronted with a factual challenge to its jurisdiction cannot ignore a factual dispute simply because it arises at the pleadings stage. *ACLU of Fla. v. City of Sarasota*, 859 F.3d 1337, 1340 (11th Cir. 2017). Instead, a plaintiff must have ample opportunity to present evidence bearing on the existence of jurisdiction, and jurisdictional discovery is a necessary tool in that process. *Id.* at 1340–41 (reversing district court's dismissal on jurisdictional grounds and remanding to allow jurisdictional discovery).

Should the Court discern that its jurisdiction is unclear and that there are disputed facts that go to the issue of jurisdiction, Plaintiff respectfully requests leave to pursue written discovery and conduct a 30(b)(6) deposition regarding jurisdictional matters.

### CONCLUSION

Plaintiff Gary Andres has brought this case based on exposures to asbestos that his deceased father (a former Florida resident) sustained in Florida. Defendant Huntsman is responsible for asbestos-containing aerospace adhesives that it delivered into the national market, which includes Florida. Serving the market for Florida, whether directly or indirectly, suffices to establish specific personal jurisdiction over an out-of-state defendant like Huntsman, which cannot establish that defending the case here would be constitutionally unreasonable. Further, the clear allegations of in-state harm perpetrated by an out-of-state manufacturer's products easily meet the plain language of Fla. Stat. § 48.193. This Court should deny Huntsman's Motion. However, if this Court is inclined to believe Huntsman's factual allegations, then Plaintiff must be able to fully discover the underlying facts.

                                  Respectfully submitted,

By:    */s/ Dawn Besserman*
       Dawn Besserman, Esq. – FBN: 1000428
       Thomas J. Irvin, Esq. -*admitted Pro Hac Vice*
       Maune Raichle Hartley French & Mudd, LLC
       777 S. Harbour Island Blvd., Suite 310
       Tampa, FL 33602
       T. 314.241.2003
       dbesserman@mrhfmlaw.com
       tirvin@mrhfmlaw.com

       ***ATTORNEYS FOR PLAINTIFF***